Report of Committee in favor of awarding seat to Joseph M. Murphy.
Assembly Chamber, March 21st, 1866.
Mr. Pitts, from the committee on privileges and elections, to which was referred the petition of Joseph M. Murphy, that he may be awarded the seat how occupied by Hon. James F. Crawford, reported in writing adversely thereto, as follows :
Majority Report of the Committee on Privileges and Elections in Relation to the Contested Seat of the Fourth Assembly District of the County of’ Albany.
The undersigned, members of ■ the committee of privileges and elections, to which was referred the memorial of Joseph M. Murphy of the-city of Albany, claiming that he was at the last general election held November 7th, 1865, duly elected a member of Assembly from the fourth Assembly district in the county' of Albany, and that he is rightfully entitled to the seat therein, now possessed by James F. Crawford, do respectfully report:
*381 That on the twelfth day of January, 1866, the committee met pursuant to the call of the chairman, at the capitol in the city of Albany,' and a resolution was passed that the contestant serve upon the sitting member within five days, a statement of the grounds upon which he claims the seat of the sitting member, and the names of voters whose votes were claimed to be illegally ^ast, and that the sitting member serve a similar statement upon the contestant on or before the thirtieth of January, 1866, which resolution was complied with by the respective parties, and the said statements will be found at pages 2, 3, J, 5 and 6 of the evidence.
The whole number of votes cast in this Assembly district at the last general election for member of Assembly was four thousand six hundred and ninety-two, of which James F. Crawford, by the return of the county canvasser, received two thousand three hundred and forty, and Joseph hi. Murphy two thousand three.hundred and thirty-nine; (see evidence page 6.) The first allegation in the contestant’s statement is to the effect that in the eighth election district, of the town of Watervliet, three electors duly qualified to vote in said district did vote for member of Assembly, but their names were not entered on the poll lists kept at said election as voting for mem: her of Assembly. Two of these ballots were for the contestant and one for the sitting member. The number of ballots exceeded the number of names on the poll list, checked as voting for member of Assembly; three votes and three ballots were drawn out of the whole number and destroyed, one of which was for Crawford and two for Murphy. (See statement allegation first, and evidence pages 7, 8 and 9.) This allegation was substantially proved, and upon the agreement it was conceded by the counsel for the sitting member that two votes should be restored to the contestant and one to the sitting member. There being no dispute as to the above facts, no time need be taken in a discussion of the facts or law involved, and the votes will be restored to the respective parties as above indicated.
The second allegation in the contestant’s statement will be considered hereafter in connection with the first allegation of the statement made by the sitting member, as they both involve the same and an important principle of law, and a construction of the registry law of last year.
The contestant in this third allegation claims that he was deprived of one vote in the western election district of the seventh *382 ward of the city of Albany, which ballot was placed by mistake in the judiciary box.
A ballot found in a box different from that designated by its indorsement shall be counted if there shall not, by so doing, be produced an excess of votes over the number of voters as designated by the poll lists. (Laws of 1842, chap. 130, page 109, sec. 38, title 4.)
The foregoing is that portion of the statute applicable to cases of this kind, and the decision of this vote in question demands an examination of the evidence.
Three witnesses testify that a ballot was found in the judiciary box for Joseph M. Murphy, for member of Assembly, viz. : James Ward, one of the inspectors, page 20 and 21 of the evidence, Tunis Yisseher, evidence pages 21 and 22, William Gibson, poll-clerk, evidence pages 26 and 2J; and that this ballot, through mistake or otherwise, was not allowed and returned. These three witnesses swear positively to this fact, and there is no contradiction in their evidence upon this point. Two witnesses, James Mulcahy, one of the inspectors, evidence page 44, and William Murphy, the other inspector, both testify that the vote in question was found in the judiciary box, but that it was counted and allowed for the contestant. These witnesses all agree that in this district the number of ballots cast fell short of the number of electors checked as voting on the poll lists two votes; that one ballot was found in the constitutional amendment box for Crawford, which was allowed, and the one found in the judiciary box for Murphy would make the number of ballots agree with the number of voters cheeked as voting, and it should have been allowed. From all the evidence, we are of the opinion that this ballot for thé contestant was not allowed or returned, through the mistake or oversight of the inspectors, and it must accordingly be added to the vote of the contestant, making his vote in this district two hundred and ninety.
The vote of William Parker, claimed by the contestant in the fourth allegation of his statement, it was conceded upon the argument by his able counsel, should not be allowed. As a matter of fact, we must hold that this voter did not offer his ballot until after the closing of the polls, which were closed at the regular and proper time, and it could not therefore be allowed to the contestant in this examination. (See evidence, pages 23, 24, 44 and 50.)
The board of county canvassers allowed for the sitting member one *383 Ballot, returned as Raving been cast for J. P. Crawford, and two retixrned as having been cast for James C. Crawford, which it is claimed in the fifth and last allegation of contestant’s statement was improperly allowed. There were union ballots with the name of Joseph M. Murphy erased, and the name of the sitting member written thereon; one of the ballots had the name James written at the left of Joseph M. Murphy, which was erased, and at the right, C.' Crawford, and underneath the erasure the name James C. Crawford again written. (See evidence, page 68.)
The counsel for the contestant conceded that the first two votes above named should be allowed, but that the last one with the name James C. Crawford written thereon twice should be rejected for the reason that by statute each ballot must contain the name of but one person for the same office.
The intention of the voter should be ascertained, if possible, and technicalities, and unimportant mistakes should not be allowed to deprive him of his ballot. ■ It is proved that the sitting member has lived in this election district for many years, has an extensive acquaintance, and no proof is made that any other person of the same name lives in the district. We consider the law as settled that ballots cast as these were, and under all the circumstances, are to be allowed, and we understand the counsel for the contestant to hold this same view of the law. (People v. Cook, 8th New York, 61: Low v. Niven, Folger’s Report, pages 16 and II.)
As to the ballot with the name of the sitting member written thereon twice, we do not see how it can be successfully maintained that this ballot is void as containing the name of two persons for the same office. It is the same name, and the name of the same person written thereon, and by no possibility can be deemed as the name of two different or distinct persons.
In the case of The People v. Saxton, 22 N. Y. Reports, page 311, the Court of Appeals held that a ballot cast for Silas Saxton for county treasurer, should be allowed, when the name of his opponent had not been erased, and the ballot read as follows : Silas Solomon S. Hommell Saxto'n, Silas being written before and Saxton after the printed words, Solomon S. Hommell. How was the name of two persons upon one ballot for the same office ? Still the court held that it should be allowed to Silas Saxton, as it was apparent that it was intended for him. In the case of Low v. Niven, above cited, one ballot was found with the names, for Senator, Low, Low, which ballot *384 was allowed, and we would call attention to the very able argument upon this subject in that standard authority. Henry J. Yanderwer-ken testifies that he cast the ballot containing the name of the sitting member written thereon twice ; that he was acquainted with Crawford, and it was his desire and intention to vote for him. (See evidence, page 68.) This witness wrote the name of James C. Crawford in the presence of the committee, and we could not discover any difference between the handwriting on the ballot in question and the name written by him. The intention of the voter is clearly shown; we cannot hold that writing the name of the same person twice on a ticket is a violation of the statute requiring the name of but one person to be written or printed on the ballot, and both from principle and construction of the statute by the courts, we believe this ballot must be allowed the sitting member, and accordingly hold that it shall not be deducted from the vote returned for him.
This brings us to a consideration of the votes of Le Qui and Thomas Jackson, both residents of the eighth election district of the town of Watervliet. Le Qui offered to vote; it was decided by a majority of the inspectors that his vote could not be received for the reason that he was not registered, and one of the inspectors received his ballots, placed them in his pocket, and they were introduced in evidence before the committee. Jackson’s ballots were received by the inspectors, and although his name was not registered his ballots were deposited in the ballot-boxes, and his name placed on the registry on the day of election. This ballot was cast and allowed for the contestant. It appeared that the board of registry in this district adopted a rule, that any person desiring to be registered who had formerly lived in another district, should bring a certificate from the registry board of that district, certifying that his name had been taken from their registry list. Le Qui did not bring this certificate until election day, and his ballots were rejected as above stated. Jackson did bring ,his certificate to the board at their last meeting, and through some mistake or oversight his name was not registered, and the inspectors decided to receive his ballot, and register his name on election day, on the ground that he had complied with their order. These facts are undisputed. There is no doubt that both these persons were electors, entitled to vote at the last general election in said distinct, provided they were duly and properly registered. The registry board had no right to make and enforce the rule they did; it was sufficient when a man complied with the law, 'and they *385 transcended their power by imposing any additional condition ; for this there is no doubt of their personal liability to the party aggrieved. The simple question is, whether, when an elector has complied with the statute so far as he is concerned, and entitled to he registered, and through mistake, neglect or intention his name is not registered, he is entitled to vote. This requires an examination of the law of 1865. The law of last year, after providing for the appointment of registry boards, times of meeting, etc., contains the following provision :
“ It shall be the duty of the said inspectors carefully to preserve the said list for their use on election day, and to designate one of their number or one of the clerks at the opening of the polls to check the name of every voter, voting in such district, whose name is on the registry and no vote shall be received at any annual election in this State, unless the name of the person offering to vote be on said registry, made and completed as hereinbefore provided, preceding the election; and any person whose name is oh the registry, may be challenged, and the same oaths shall be put as are now prescribed by law. This section shall be taken and held by every judicial or tribunal as mandatory, and not as directory. And any vote which shall be received by the said inspectors of election in contravention of this section shall be void, and shall be rejected from the count in any legislative or judicial scrutiny into any result of the election.”
While a legislative committee have greater power in some respects in cases like this than a judicial tribunal, still we are to be governed by rules of evidence, the law of the land, and the well settled principle of construction which the wisdom of ages has produced!
The position of the contestant is, that under the law itself, when a person who is legally entitled to vote, has done all in his power to be registered, that it is no violation of the statute to receive his vote; and he claims to make a distinction in a case like the one of Jackson, and when an elector who voted the year before does not attend the board to be registered. It seems to us that there can be no mistake in the language of the above statute ; it is full, strong and explicit; it declares in - positive terms that no vote shall be received unless registered, and if any such vote shall be received in any scrutiny into the result by any tribunal or legislative committee, the same shall be deducted; and also declares that its provisions shall be construed as mandatory and not directory. No .one can mistake the meaning of this language, and how much w;e may differ as to the *386 constitutionality of the law, there can be no difference of opinion as to its meaning.
It is the duty of courts in construing statutes to give effect to the intent of the law-making power, and to seek for that intent in every legitimate way; jmt it is to be sought first of all in the words and language employed; and if the words are free from ambiguity, and express clearly the sense of the framer, there is no occasion to resort to other means of interpretation. The office of interpretation is to bring a sense out of the words, not a sense into them. When the language is plain, the Legislature must be understood to mean what they have clearly expressd, and there is no room 'for contradiction. We have no right to resort to forced or subtle construction for the purpose of either limiting or extending the effect of a statute. Courts cannot correct what they may deem excuses or omissions in legislation, nor relieve against the occasionally harsh operations of a salutary provision, without the danger of doing vastly more mischief than good.. (See McCluskey v. Cromwell, 11 N. Y., 593; Newell v. People, 7 N. Y., 97; Smith’s Statutory and Constitutional Construction, section 650; Whalen v. Harris, 20 Wendell, 555, 562.)
It is also our duty to so construe a statute as to meet the mischief and advance the remedy, and not violate fundamental principles. (Iiall v. Cline, 8 Johnson, 41.)
The statute u;nder consideration was enacted to remedy an evil in the previous law, by which persons not registered were permitted to .vote. The old law was held directory, and it was the intention of the Legislature to compel electors to be registered ; and in order to prevent persons from voting who had not complied with its provisions, it was declared to be peremptory. We do not see how human language could have made it any stronger. There is no difference in principle between the right of Jackson to vote, and an elector who had voted the previous year, whose name was on the poll lists of the previous year, and who by the law had a right to believe that his name would be registered, as it is the duty of the board' to register all names of persons on the poll lists of the previous year, and it is a presumption of law that all public officers do their duty. (Hartwell v. Hoss, 19 Johnson, 345.)
If we are to give any effect to the registry law of 1865, the vote of Jackson must be registered. There is no doubt that this construction may, in some individual cases, prevent an elector from voting ; but when the public good is in question, we have no right to fritter *387 away salutary provisions to relieve individual cases. “It is liard cases which make bad law.” To give the effect to the statute claimed by the contestant, would be virtually deciding that the law in question is unconstitutional — a length we are liot prepared to go.
By the Constitution, every male citizen of the age of twenty-one years, who shall have been a resident of his district for the length of time prescribed, shall be entitled to vote for all officers to be elected. By section two, article two of the Constitution, the Legislature is empowered to pass laws excluding from the right of suffrage all per-, sons who have been or may be convicted of bribery, larceny, or of any infamous crime; and for depriving every person who shall make or become directly interested in any bet or wager depending upon the result of any election, from the right to vote at such election.
By section four, the Legislature is empowered to enact laws for ascertaining by proper proof the citizens who shall be entitled to the right of suffrage hereby established. The Legislature have always exercised the right to pass laws for the purpose of preventing illegal and fraudulent voters from voting, and thus influencing the result. Both of these sections are to be construed together, and under the last provision we do not see how it can be Successfully maintained that the present law is unconstitutional. Laws have been passed providing that in certain cases the elector should not be permitted to vote unless he should comply with certain regulations and conditions, and take an oath prescribed by the statute. "Would it be contended, that because some person with conscientious scruples against taking an oath should be repelled from the polls and prevented from voting, that the law would be void because it should so operate as to deprive such a person of the right to vote? We can discover no difference in principle between the compelling of electors to take oaths in certain cases, on any of the provisions previously passed, and the law in question, as far as the constitutional right to enact the law is concerned. The Legislature have not only the power but it is their duty to pass all necessary laws to preserve and protect the ballot-box. It is no reason that the law is invalid because in some instances electors shall be deprived of their right to vote, by reason of any act or negligence of theirs or on account of the failure on the part of the officer to whom the execution of the same is intrusted to perform his duty. The object of the registry law is to ascertain, by proper proofs, the persons entitled to exercise the right of suffrage, and because the same is stringent in its provisions, so long as only proper proofs are required, *388 the objection made that iii some cases persons entitled to vote maybe deprived of their right on account of a failure to comply with its provisions, certainly cannot be successfully maintained, and would apply to all previous legislation upon this subject. We believe it is universally conceded that the compelling of electors to take oaths in certain 'cases comes within the letter and meaning of the Constitution, and as we have endeavored to show, the statute in question is the same in principle as previous legislation. The committee have already passed upon a similar question in the case of James S. Lyon against William Williams, by which we refused to allow the ballots of voters not registered, and the said report unis sustained by the. House. '
There is no difference in principle between these votes and those rejected in the above case. In tire case above refei-red to, three voters, v'ho had voted the previous year and whose names were on the poll lists of the previous year, were not registered. By the statute in question, it was the duty of the board to register these voters, and they were not obliged to 'attend the board to be registered, but had the right to rely and trust in the faithful performance of their duty upon* the part of the registers, in case above cited, and it can make no possible difference whether they attended the board, as in the previous case, or whether they relied upon their names being registered in pursuance of the statute, in neither of these cases is it shown that the registry board acted fraudulently or in bad faith. It is eviden t that they both were mistaken in the law, and in the one case failed or omitted to register legal voters, and in the other demanded additional conditions to be complied with not provided by the statute; but these conditions were general, and cannot possibly be construed as fraudulent.
The vote of Jackson must be deducted from those .of the contestant, .and the vote of Le Qui cannot be allowed.
The sitting member charges in his second allegation that Timothy Stanford voted for Joseph M. Murphy, and that he was not a legal voter on account of having been convicted and sentenced to the State prison for the crime of grand larceny.
Stanford testified that he voted for the contestant in the third election district of Watervliet; that he took a democratic ticket, erafeed the name of Crawd'ord and wrote thereon the name of the contestant, and voted it. (See evidence, pages 65 and 66.)
The inspector for this district testifies that the name of Timothy *389 Stanford is on the poll-lists as having voted for member of Assembly, and also that' a democratic ticket was found with the name of contestant written thereon, as sworn to by said Stanford. This witness being uncontradicted and corroborated in these two points, we hold that we should not be justified to reject his evidence. (See evidence, page 68.)
This man Stanford was not at the time a legal voter, he having previously been convicted of a felony and sentenced to the State prison, and by the law of this State he would not be permitted to vote unless restored to his civil rights by a pardon of the Governor. (See evidence, page 67.)
Stanford was pardoned by the Governor, February 6, 1866, which restored his competency as a witness. (See evidence, page 79.)
This vote must be deducted from those allowed the contestant.
There was 'proof given by the sitting member relative to ballots not received by the inspectors, and claimed by him to have been improperly rejected, which we are not required to examine, as it cannot possibly affect the result, and we do not pretend to pass upon the question of fact, whether they were offered by the voters in question and improperly rejected. Granting .that they were, we could not allow them to the sitting member; the most we could do in such cases would be to set the election aside, in case a sufficient number of legal ballots had been.improperly rejected to change the result. It will be seen from the evidence that the committee refused to receive proof on the part? of the contestant relative to a ballot found in the State box, in the fifth district of Watervliet, for Joseph M. Murphy, which should have been allowed. This evidence was rejected upon the ground that it was outside of the specifications. It was understood by all parties that they were to be held strictly to their specifications, and no injustice has been done the contestant by this ruling. The sitting member would have gone into proof as to other of his allegations, in case it had been necessary, or in case additional evidence had been adduced by the contestant.
The undersigned believe that it is far better for the rights of all, and 1 the good of the people of this State, that the law should be maintained, even if in some cases it may work a hardship, and that there would be far more danger to set law at naught because it might occasionally prevent an elector from voting. No human law can be perfectly executed or work exact jv ce, and we can only endeavor to approximate as near to a perfect standard as possible.
From the above findings it is apparent that the sitting member, *390 James T. Crawford, was duly elected member of Assembly from tlie fourth Assembly district of the county of Albany, at the last general election, by a majority of one, as will appear by the schedule hereto attached, marked A, and we do therefore recommend the adoption of the following resolution:
Hesolved, That Hon. James F. Crawford was duly elected member of Assembly for the fourth Assembly district of the county of Albany, at the general ¿lection held in November, 1865, by a majority of all the legal votes cast therefor in said district, and that he is entitled to retain the seat in the Assembly now occupied by him.
EDMUND L.- PITTS.
P. J. DOWNING.
LEWIS POST.
Albany, Mwrch 20, 1866.
I concur in the foregoing report excepting so much thereof as passes upon the question of the constitutionality of the registry law of last year.
In regard to that act, I cannot agree that the provisions thereof are within the spirit and intent of the Constitution. I, however, concede that until the law shall, be declared by some competent judicial tribunal to be unconstitutional, we are bound by its provisions.
WM. D. YEEDER.
Albany, March 21, 1866.
Schedule (A) bbeekbed , to.
Whole number of votes cast for James E. Crawford. 2 >340
Add one vote improperly drawn out in eighth election district, Watervliet. 1
Crawford’s vote. 2 > 341
Whole number of votes cast for Joseph M. Murphy.. i 2>339
■Add two votes improperly drawn in eighth election district, Watervliet. 2
Add one vote found in judiciary box in western district of seventh ward.. 1
2 >342
Deduct one vote of Thomas Jackson not registered. 1
Deduct one Vote of Stanford, a convicted felon. 1
— 2
Murphy’svote. 2>340
Leaving majority for Crawford!... 1
*391 Assembly Documents, vol. 7, 1866, No. 164. See Assembly Documents, 1866, vol. 4, No. 66, for memorial, reply, evidence, etc., etc.
REPORT OF MINORITY OF COMMITTEE IN FAVOR OF AWARDING SEAT to Joseph M. Murphy.
Assembly Chamber, March 21 st, 1866.
Mr. Levinger from the committee on .privileges and elections, to which was referred the petition of Joseph Ml Murphy, that he may be awarded the seat now occupied by Hon. James F. Crawford, reported in writing, dissenting from the views of the majority, as follows:
In Assembly, March 21 st, 1866.
Minority Report of the Committee on Privileges and Elections, in Relation to the Contested Seat of the Fourth Assembly District of the County of Albany.
The undersigned, one of the committee of privileges and elections of your honorable body, to which was referred the petition of Joseph M. Murphy, claiming that he was, at the general election held on the 7th'day of November, 1865, duly elected a member of your honorable body, from the fourth Assembly district, in the county of Albany, and that he is entitled to the seat therein now possessed by James F. Crawford, does respectfully report:
That he dissents from so much of the majority report made in this matter, as refers- to the votes cast by Lewis Le Qui, in the eighth election district of the town of Watervliet, and by Thomas Jackson, cast in the same district.
. The subscriber is of the opinion that the vote cast by said Lewis Le Qui, at said election, and which was not canvassed, should have been counted, and should now be allowed in favor of Joseph M. Murphy, and that the vote cast by Thomas Jackson was properly allowed and counted for said Murphy, and.should not now be deducted from his vote.
In coming to this conclusion, the subscriber is well aware that in the case of Lyon v. Williams (just decided by the committee of privileges and elections, of which the subscriber is a'member), the committee disallowed to James S. Lyon three votes cast by legal voters, whose names were not on the register of electors of the district in which they voted. The subscriber cannot now perceive how that commit *392 tee could have arrived at any other conclusion. In that case it was clearly proven that tbe three voters (Norris, Deeves and Peck) had neglected to have their names placed upon the registry list, at any rate, that tliejr had not exercised the proper care and vigilance to see whether their names were properly on said list; and there was nothing before that committee to decide upon, than the simple construction of the sixth section of the registry law of 1865, and that ’section declared in plain and unmistakeable terms, that no vote shall he received at any annual election in this State, unless the name of the person offering to vote be on the registry, made and completed according to said lawthe subscriber does not see how it could have been claimed that those three votes should have been counted in favor of the contestant in that case. There was no charge in that case nor any attempt to prove that the inspectors had intentionally violated their duty.
In this case the facts are quite different. Both Jackson and Le Qui, both of whom are conceded to be legal voters, entitled to be registered, went before the board of registry and requested to have their names placed on the register. The inspectors, in violation of their plain duty, instead of placing the names of said voters on the register, compelled them to go and obtain a certificate from the inspectors of the district where they had resided and had voted the year previous before they would place their names on the register. Moreover, in the case of Jackson, it was proved that he actually brought back to the inspectors the required certificate the day before election, and yet, when he came the next day to vote, his name was not found on the registry.
And the question to me, in view of these facts, which áre undisputed, is not as presented by the majority report, “What is the proper construction of the sixth section of the law of 1865 ?” But it is this : When a voter has done all the law requires him to do, .for the purpose of having his name ¡fiaced on the register (aye, even more, as in the case of Jackson), and the inspectors of election refuse to do their duty, and intentionally omit his name from the register, what is the proper remedy? Shall the sixth section of the law of 1865 be made a m'eans, in the hands of unscrupulous inspectors, to exclude legal voters from the exercise of their right of suffrage ?
The majority of the committee, in their report, say that in such a case the inspectors are no doubt liable to the persons injured; but that is not the question at all. The question is, shall it be in *393 the power of the inspectors (even if they ai'e willing to incur personal responsibility), to- defeat the will of the majority of the voters ?
It will be observed that there is no provision in the law of 1865 by which the inspectors of election, if they refuse to place the name of a voter on the register, can be compelled in a summary manner to do their duty.
Now, supposing the inspectors of some district should conspire, to defeat the will of the majority of the legal voters, and should strike the names of one hundred voters, opposed to them in politics, from the list, or omit or refuse to place upon the register the names of one hundred legal voters, whose legal right it is to be placed on the register, and those one hundred voters should be excluded from voting on the day of election, would any sane man say that all the remedy the people had in such a case, would be to sue and prosecute those inspectors, but that under section six of the law of 1865 the names of those one hundred voters, not being on the register, their votes were properly excluded, and the election should be held to be valid ?
Would not, on the contrary, every candid person say that the spirit of that law had been grossly violated, that it had been used as a cloak to cover an act of infamy, and would not any legislative committee or judicial tribunal, having the power, set aside such an 'election and order a new election ?
Yet, what is true of an hundred votes must be true of two votes. If it can be proved to the satisfaction of your honorable body that two names were improperly and in violation of law omitted from the registry list, that two legal voters were intentionally deprived' by the inspectors of their right of suffrage, and that those two votes affect the result of election, is it not your duty to order a- new election for the purpose of ascertaining the wish and intent of those two voters ?
This is doing no violence to the law of 1865. It is not affecting its constitutionality ; it is not even questioning it.
■ It is, on the contrary, warning the inspectors to énforce and administer it in a proper spirit, and not to abuse the powers intrusted to them by its provisions.
■ If it Avere otherwise, if the sixth section of the law of 1865 could be so construed as to absolutely exclude — even upon a legislative or judicial scrutiny — the votes offered by legal voters Avho did all in their power to become registered, and who were intentionally refused by the inspectors to have their names placed on the register, on no *394 other ground than that their names do not appear on such register, I would indeed be constrained to hold the law of .1865 unconstitutional, because it would furnish the means to unscrupulous men to disfranchise a citizen and deprive him of his constitutional right of suffrage, not by the law of the land or the judgment of his peers, but by the simple arbitrary power of three inspectors of election.
Iu conformity with these views, the subscriber holds (and in that respect he agrees with the majority of the committee), that under the sixth section of the law referred to, it was technically proper to exclude the vote offered by Le Qui, and it would have been equally proper to exclude the vote of Jackson; but under the evidence as elicited, as those two votes would have affected the result of the election, the subscriber would have been constrained to hold that election void, and recommend a new election.
Happily, in the present case, we are saved the unpleasant necessity of ordering a new election.
In the case of Le Qui, the ballot cast by him was received and registered by one of the inspectors, and by him brought before the committee; and in the case of Jackson it was actually received and canvassed by the inspectors, and as a new election would only tend to ascertain the will of the electors, and as we have the evidences of that will before us, such election is unnecessary.
As both of those electors are proved beyond any doubt to have voted for J oseph M. Murphy, the subscriber has come to thé conclusion to allow both votes to and to count them in favor of Joseph M. Murphy. And as in all other matters he agrees with the majority of the committee, as expressed in their report, he simply adds those votes to the aggregate vote of said Murphy, found in said majority report.
Making the number (instead of 2,341).'. 2 > 343
Crawford’s vote by said report. 2 > 342
And therefore find a majority in favor of Murphy of.... 1
The undersigned, therefore, recommends the adoption of the following resolution :
. Resolved, That J oseph M. Murphy has been duly elected a metnb,er of this body as member of Assembly from the fourth Assembly distinct of the county of Albany ; that he is entitled to the seat therein *395 now possessed bv James IT. Crawford, and that the said Joseph M. Murphy he placed in possession thereof.
All of which is respectfully submitted.
ADOLPH LEYINGEB.
Dated March 15, 1866.
Assembly Documents, 1866, vol. 1, No. 161, pages 1, 2, 3 and 4. See Documents, 1866, vol. 4, No. 66.
Mr. Levinger moved that said reports he made a special order for Wednesday, March 28th, at 12 o’clock, noon.
Mr. Speaker put the question whether the House would agree to said motion, and it was determined in the negative, two-thirds of all the members present not voting in favor thereof.
Mr. Speaker then put the question on the adoption of the minority report, and it was determined in the negative.
Ayes, 14. Noes, 82.
BePORT OF MAJORITY ADOPTED.-SEAT AWARDED TO JAMES F. Crawford.
Mr. Speaker then put the question on the adoption of the majority report, and it was determined in the affirmative.
Assembly Journal, 1866, vol. 1, pages 813, 814.